The next case on our call this morning is Agenda No. 15, Case No. 104692, Morr-Fitz, Incorporated v. Rod Blagojevich, Governor. Mr. Rienzi, is that correct? Yes, Your Honor. All right. You may proceed, Mr. Rienzi. Good morning, and may it please the Court. Counsel, I'm Mark Rienzi for the plaintiffs. The plaintiffs here are two individuals who, between them, have practiced pharmacy in this State for nearly 50 years, along with the four pharmacies that they own and operate. The plaintiffs are prohibited by their religion from participating in the sale of drugs known as emergency contraceptives and therefore have policies against participating in such sales. The final rule at issue in this case requires the plaintiffs, upon presentation of a prescription and request by a customer, to dispense emergency contraceptives. Is this a different case than what it was when it started? The day-after pill is no longer – a prescription is no longer required for the day-after pill. A prescription is no longer required in certain circumstances, Your Honor, but I don't think it's actually a different case than it was when it started. What are those circumstances? Prescription is required for customers who are under the age of 18, but the fact that that's the only circumstance in which a prescription is required does not mean that other older customers don't also come in to seek the drug on a prescription basis as opposed to an over-the-counter basis. For example, customers may gain insurance benefits or may have the drug covered by public aid programs if they come in and obtain it via a prescription, which they would not get for the over-the-counter sales. None of this information, to be sure, appears in the complaint because the FDA regulation for the over-the-counter ruling happened more than a year into this case. But it's clear that the drug is still available by prescription. The defendants have made clear that they still intend to enforce this rule in those circumstances and that, in this case, inferences are supposed to be made in favor of the plaintiffs and that it would be improper for the appellate court, frankly, and we submit it would be improper for this court to make inferences about what may or may not happen in those circumstances against the plaintiffs. What's pled in the complaint is that people have come in for this drug in the past. They have presented prescriptions for the drug in the past, that the plaintiffs have policies against dispensing the drug, that in the past when presented with prescriptions they have refused to dispense the drug, that the final rule at issue here requires them to dispense the drug, that the final rule at issue here would require them to compel their employees, in violation of the Health Care Right of Conscience Act and other laws, to dispense the drugs. This applies only to contraceptive drugs, is that right? That's correct, Your Honor. All contraceptive drugs. All prescription contraceptive drugs, that's correct, Your Honor. But the complaint focused on the morning-after pill only. That's correct, Your Honor. Does that mean that these same pharmacists have no objection to other contraceptive drugs? That's correct, Your Honor. These pharmacists and these pharmacies do not have policies against selling standard contraception. They do have policies against selling emergency contraception. The State has made it as clear as possible that if, in those circumstances, the defendants adhere to their religious views, they will face a serious threat to their professional licenses and their careers. And the State has sought revocation of license. Would that happen if they choose not to even sell or stock any contraceptives at all? I'd say that's unclear from the face of the rule. That is the position that the defendants have advanced in this litigation. And even if that were true, Your Honor, I don't think it changes the ripeness question. In other words, these plaintiffs do sell other contraceptives. Therefore, this rule does require them to sell emergency contraceptives. But on the face of the rule, the rule says it applies to all Division I pharmacies. It doesn't say only to some.  And it says that a pharmacist... To the pharmacist or to the pharmacy? Well, it applies to the pharmacy, Your Honor. But under Illinois law, a pharmacy cannot dispense anything. The only person who can dispense a prescription drug is a pharmacist. So any requirement on a pharmacy to dispense a drug is necessarily a requirement to find a pharmacist to dispense the drug. In this case, one of the issues is the plaintiffs, who are both pharmacists and owners of the pharmacies, object to selling or dispensing the drug either personally or in their store. But even if they decided, while they can't personally be involved in the sale, that they would be okay if their store sold the drug. Under the Health Care Right of Conscience Act, they can't even go out and solicit employees to try to find someone who's willing to sell the drug. Because Section 7 of the Health Care Right of Conscience Act, which is on its face a very, very broad law, clearly designed to provide broad protections. Section 7 of that law prohibits the plaintiffs from even placing statements in their application about issues of conscience or even orally questioning an applicant. And this dilemma arises because the defendants are under the fundamental misconception that they are operating outside the bounds of the Health Care Right of Conscience Act. I'd submit that it's very clear from the face of the Health Care Right of Conscience Act that that act was created specifically for situations exactly like this one. That act states on its face that it is designed to provide broad protection. That act recognizes, actually it says, that the General Assembly finds and declares that people and organizations hold different beliefs about whether health care services are morally acceptable. And it says it is the public policy of the state of Illinois to respect and protect the right of conscience of all persons, whether acting individually, corporately, or in association, from all forms of discrimination, disqualification, and coercion, among other things. The definition of health care services in the act is extremely broad. It applies to any phase of patient care. It expressly refers to family planning, counseling, or other advice in connection with the use or procurement of contraceptives. It expressly refers to medication. It protects any person against discrimination by any person, including public officials,  And in this case, I point out that in the three administrative complaints that are referenced in the state's brief, I believe at page 21, and there's a web link provided there, if you take a look at each of those three complaints, for the very first offense, the state seeks revocation of license. There is nothing that is abstract or remote about the dilemma that the plaintiffs face. The plaintiffs' doors are open every single day. Every day, someone could walk in with a prescription and require the plaintiffs to fill it or to transfer it to another store or to order the drug. If in those circumstances the plaintiffs adhere to their religious beliefs, they have faced a direct and overt threat from the chief law enforcement officer of the state that their license is at risk. Governor Blagojevich repeatedly, publicly, has stated that the point of this rule is to make sure that religion, quote, does not stand in the way of a pharmacy's obligation to dispense. He said that pharmacies must dispense medication, quote, without making moral judgments. But the legislature, the General Assembly, has already established the policy and the law of Illinois that individuals do get to make moral judgments about what processes and procedures they themselves will personally be involved in. That's the point of the Health Care Right of Conscience Act. Counsel, is it any kind of a problem for this court to consider what the governor may have said in the press release? I don't think it is, Your Honor. The court under People v. Henderson can take judicial notice of public materials. Those I've checked within the past week. Those statements still appear on the governor's website. I believe the governor's public statements are highly relevant here, at least for the free exercise claim. I'd refer the court to the Church of the Lukumi v. City of Hialeah case. There, the court specifically focused on the statements of the enforcement authorities and the authorities who passed the rule as being highly probative of the government's intent in passing the rule. And I'd also point the court to Judge Scott's decision in Menges v. Blagojevich, in which that specific issue was raised as to whether the court could consider these statements by Governor Blagojevich. And she said under Church of the Lukumi that those statements were highly probative and relevant to showing the government's intent. The Church of the Lukumi claim is particularly important here because that claim says that even if the rule were totally neutral, it is subject to federal free exercise challenge, and I'd submit similar state free exercise challenge, on the ground that it is designed to target religious objectors. That is the ground that Judge Scott upheld against the motion to dismiss in one of the two Menges v. Blagojevich opinions. That's also the ground on which a federal judge in the Stormins v. Selecky case, which was issued in the fall of 2007, enjoined a very similar law in Washington State. That claim is clearly pled in the complaint, and it is certainly ripe for review now. The plaintiffs are subject to this rule now, and therefore they have a right to come to court and seek judicial protection consistent with Illinois law to protect them from this deliberate coercion. I think it's important also to realize the point of this rule is coercive. A rule like this would have no point but to coerce people who otherwise weren't willing to dispense the drug to dispense the drug. On its face, this rule is an attempt by the executive branch to use its power over pharmacy licenses to compel people who were otherwise exercising valid statutory and constitutional rights to not be compelled, and it's using that government power to compel them to do something they were otherwise choosing not to. In this court's decision in the Gamefowl case, it said that there was a sufficient threat of injury and enforcement because the plaintiffs owned animals that were, quote, within the meaning, scope, intent, and application of the law. We submit that the plaintiffs in this case, as pharmacists who have religious objections to dispensing emergency contraception, are squarely within the meaning, scope, intent, and application of the law. The plaintiff's dilemma is exactly the dilemma for which this state has a declaratory judgment act in the first place. And this court recognized that in the First of America Bank v. Netsch case, where the court said the point of the declaratory judgment act is to provide relief before people are forced to take action which will compromise their rights. I submit to the court that if the plaintiffs cannot get declaratory relief now, when they are currently subject to a fully effective final administrative rule, there is no later point at which declaratory relief is possible. As a practical matter, it would make no sense to say that the plaintiffs have to wait in their stores with the doors open every day and with citizens walking around with prescriptions who are empowered by the defendants to come in and force the plaintiffs to violate their rights, violate their free exercise rights. It would make no sense to wait until someone's right in front of you with that prescription and then say, time out, now I'm allowed to go to court and get a decision on this. Likewise, it would make no sense and the plaintiffs are not required to wait for the ax to fall, to wait until someone challenges their license and then come to court as a defensive remedy. The broad protections that the General Assembly enacted, both in the Health Care Right of Conscience Act and in the Religious Freedom Restoration Act, they both clearly say that they are designed to protect people from coercion and burden. They are not only designed to protect people after the ax has fallen, after your license is taken away, after your career is ruined. Those statutes are protective of fundamental and inherent and inalienable important rights under state and federal constitutional law. And I suggest that one of the... It's your contention, Mr. Rienzi, that both the Conscience Act and the Religious Act offer the right to file an affirmative claim, right? That is, Your Honor. Okay. And I'd suggest that... A defense or a claim. Those statutes, and I may mix them up unless I get it in front of me, they both say claim or defense. One of them expressly refers to, and I think it may be the Religious Freedom Act, expressly refers to filing a judicial action to protect the right. But I would suggest that those rights and those remedies would be of far less value than the legislature intended for this court to hold, that they were only effective after someone has actually been fired or lost their license or lost their business. The point of those laws is to protect people from coercion. And to be clear, this rule, from its issuance, has a real, actual, coercive effect. That's the point. The plaintiffs are forced by this rule to make decisions about what their policies will be, how they will instruct their employees, which contraceptives they will and will not stock. This rule itself is deliberate and direct pressure on the plaintiffs to change their position on this issue. This rule in itself is government pressure to change their beliefs or violate those beliefs. That's what these laws are designed to protect. And I'd suggest that the appellate courts, one of the several problems, honestly, with the appellate court's opinion, is that the appellate court simply doesn't address the Health Care Right of Conscience Act and the Religious Freedom Restoration Act. It gives them a single sentence at the end of the opinion where it says, nothing in those acts makes the claim ripe. Those acts are the focus of plaintiff's claims. Those acts, as discussed by Justice Turner in the dissent, are the clear, strong indications of Illinois law that plaintiffs in exactly this predicament are permitted to come to court and to seek protection from illegal government coercion. But even if those rights did not exist, I'd submit to the court that under this court's standard declaratory judgment jurisprudence, the plaintiffs are still permitted to come to court. This court has recognized in First of America that the mere assertion of a claim or challenge to plaintiff's legal rights is sufficient to ground a declaratory judgment claim. Many, many lower court cases in Illinois have held that a plaintiff has a right to come to court where they are subject to a final rule or law that requires them to take or refrain from action and where they allege that enforcement of that law will harm them. That's what the plaintiffs have alleged here. And that holding can be found in the Kerr-McGee case, which I'd submit the appellate court attempted to distinguish, but I don't think the distinction holds up at all. It's in the Kerr-McGee case. It's in the Bowles-Truckin case. It's in the online fire v. Addison case. It's also in this court's Caskey decision and in the appellate court's decision in Boogie v. Lee where the courts say a plaintiff does not have to wait to provoke a disciplinary proceeding against himself to get relief. These plaintiffs need to decide and they need to know, are they at every minute in danger of losing their licenses? Should they consider what their next career will be? Should they think about moving to a neighboring state and uprooting their families? These are not small questions. These are real, significant, coercive burdens placed on them deliberately by the state defendants in order to change their actions and change their views and encourage them to do what the governor wants, which is dispense without making moral judgments. I'd suggest that the state's proposed interpretation of the rule highlights the fact that the rule is actually designed to focus on a particular moral decision and is not actually designed to promote access. On its face, the rule applies to all pharmacies and says that upon presentation of a prescription, the pharmacy must fill the prescription, must do it without delay, and must do it consistent with the time frame for filling any other prescription. The defendants in their attempt to defend the rule here have essentially tried to gut it by arguing that, even though that's what the first sentence of the rule says, the rule actually allows pharmacies to willfully and permanently remain out of stock of the drug and that if someone's got a moral objection to selling the drug, the right answer is not to simply sell all the contraceptives that you don't have a moral objection to and just keep this one that you don't. Instead, the state is actually suggesting the policy that would result in far less access to contraceptives, which is their saying, actually under this rule, the right thing to do is just say, I'm out of the contraceptive business entirely. The state never explains why or how the state has the power or any legitimate interest in saying that there's one particular moral position on contraceptives that's okay and the one they're saying that they'll allow is either all or nothing as to contraceptives, but that a decision by a pharmacist consistent with their religion that there are certain ones they can sell, but there are certain ones that they cannot sell, for some reason the state says that's not permitted. It's also clear on the face of the rule that if a pharmacy makes a business decision not to carry contraceptives or not to sell certain drugs, for some reason that's okay. But if there's a delay because the pharmacist behind the counter says, I can't sell that particular drug, that that's somehow an issue for the state. Mr. Lianzi, before your time gets away, you were at least in part asking this court to address the merits as well, is that right? Yes, Your Honor. Is it your contention that no additional fact-finding would be necessary where if we agree with your position a remand would be the appropriate course of action? There is one clear legal issue that I think is squarely before the court and requires no further fact-finding, and that is whether the rule itself is illegal coercion under the Health Care Right of Conscience Act. For that analysis, I think the court can look at the rule and look at the Health Care Right of Conscience Act and can decide that the rule itself is a clear effort by a public official to coerce people to violate their conscience, to say that as a condition of your license you must participate in this particular health care service. So I think that issue is clearly before the court, and I'd submit that if the court recognizes the rule for what it is, a clear effort at coercion, most of the rest of the case goes away. I would analogize the case to Connell v. Topenka, where the court reached the legal constitutional issue and then said at the end of it, and we can remand down for specific findings as to these plaintiffs and damages and things like that. So I don't mean to suggest that the case would totally 100 percent go away, but I do think if this court reaches that very clear legal issue, it would essentially resolve the key legal issue and leave what I would describe as small cleanup on remand. I'm surprised to see myself with an extra 30 seconds. There it goes. I'll have great stuff for you on the rebuttal. Thank you, Mr. Rianzi. Thank you, Ms. Wunder. This case presents the question, and only the question, of whether the plaintiff's challenges to the rule are ripe, and the ripeness inquiry utilizes the two-part test from Abbott Labs as applied by this court in alternate fuels, considering whether the issues are fit for judicial decision and the hardship that would ensue from postponing judicial consideration. And plaintiff's claims of coercion notwithstanding, those ripeness standards are not satisfied here, and they're not satisfied here for two main reasons, which I will address both of these reasons. Ms. Wunder, I've been informed by my esteemed colleagues that although I mentioned your name, you didn't mention your name for the record. Could you just indicate your name and who you represent for the record? Excuse me, Your Honors. I'm Laura Wunder on behalf of the defendants. Okay. That might be your easiest question of the day. Thank you. So the two main reasons why the ripeness standards aren't satisfied here is that, as both the circuit court and the appellate court found, the application of the rule to these plaintiffs is extremely unlikely, and additionally there is a statutory variance procedure here that the plaintiffs have never pursued that has the potential to exempt them from the rule and eliminate any need for judicial consideration. And because of both those factors, the challenges to the rule are unripe. With respect to the remoteness of the rule's application, as the appellate court observed, the plaintiffs here are currently in compliance with the rule, and it's extremely unlikely, based on the allegations in plaintiff's complaint, that one of the individual plaintiffs in this case will ever be placed in a position where we'll have to violate his conscience or the letter of the rule. And the remoteness here derives from two main components. The rule's application to these plaintiffs is unlikely, both because of the FDA's over-the-counter ruling from August 2006 and because of the structure of the rule itself. Give me just one moment, Your Honor, my throat's a little dry. With respect to the FDA ruling, the FDA approved emergency contraception for over-the-counter sales to persons age 18 or over, and the department's rule applies to prescriptions, not to over-the-counter drugs. And so the FDA's approval significantly reduces the number of prescription contraceptives that are going to be presented at all, and that is a relevant factor in considering the likelihood of the rule being applied. The other main factor here is the rule's structure, because the rule's provisions for drugs that are not in stock come into play here. And that's because these plaintiffs allege that they do not stock emergency contraception, and the rule does not affect that. The rule does not address stocking because plaintiffs are in a rather unique position here by not stocking emergency contraception. The typical problems have been with dispensing emergency contraception, where a pharmacy keeps it in stock, but individual employees may not dispense. But the rule would require the pharmacy to order, right? It would. So it would take the customer to say, please order it, and the rule would be put into effect. That's correct, but I think we need to examine when would a customer say, please order that. It's a very unlikely alternative under the structure of the rule, and the reason that it's an unlikely alternative is because it's by far the least likely customer choice. Then why have that as part of the rule if it's very unlikely to occur? Because, again, I think the rule here is dealing mainly with problems in dispensing that have arisen and not really addressing a situation where the pharmacy itself does not stock emergency contraception, thereby calling into play the rule's provisions for out-of-stock drugs. So the likelihood of a customer presenting a prescription and then coming into the store and saying, please order this drug, even though this drug is not in stock, which would mean a wait of uncertain duration when the customer requires that drug as soon as possible for maximum effectiveness, is a very unlikely scenario that depends on a series of contingencies. Less likely, but Justice Carmier's question touches upon the fact that would we be here today if the rule didn't say that if there's no obligation to stock but an obligation to order, if place the order wasn't in the rule itself, I would imagine that the pharmacies that have a problem with dispensing the drug would just not stock, and if they didn't have to order, what's the problem? But the rule does say that they do have to order it if the customer asks them to order it. The rule does say that they have the option of transferring the prescription as well, which is not objected to, and the option of returning the prescription to the customer, which are far more likely customer choices than requesting that the pharmacy order the drug. The pharmacist is over here, I'm sorry, on this side. The pharmacist, though, doesn't have the option of choosing one of the three alternatives. That choice belongs to the customer. The customer can make any demand under the rule that the customer chooses to make. That's correct. Do you agree that it isn't necessary for one to put yourself in jeopardy in the sense of bringing on disciplinary action in order to challenge the rule? Do you agree with that? I would say that the rule could be ripe. There's instances in which the rule could be ripe short of an actual enforcement proceeding. Now, where is that line? I think that line has to be a case-by-case, fact-specific inquiry, and here, where there is a very remote possibility of triggering the rule, I would say that falls on the side of the line where these claims are not ripe. There are additional considerations here besides just the structure of the rule and the unlikelihood of these particular plaintiffs who do not stock contraception, emergency contraception being called upon to dispense, and that arises from the variance procedure that is available under the rule and hasn't been utilized. It's interesting, though, isn't it? I mean, there's a lack of ripeness claim here, but aren't you asking this court to speculate completely as to whether on remoteness? You're saying, well, you know, this could happen, this could happen, this could happen. The facts are the rule says that they have to order. The fact is that it would only take a customer to say, please order, to initiate the rule. So isn't this court being asked to speculate completely as to whether or not the rule is remote or not as to these plaintiffs? Well, I think it's appropriate to consider, Your Honor, here that the plaintiffs went to the, that was the extreme, but plaintiffs went to great lengths to supply affidavits to this court alleging new personal facts outside the record, which we do not believe are properly before the court. And even in those affidavits and, you know, in their reply brief, they have provided nothing to suggest that ordering a drug that is not in stock is anything other than an unattractive customer choice. Well, they're relying on the Conscience Act and the Pharmacy Act. And I suspect that Mr. Rienzi would say that one request would be too many requests that would implicate the Conscience Act and the Pharmacy Act. So if we're going to speculate on the remoteness of this occurring, I mean, should this court speculate that there could be one customer out there that would ask their pharmacy that they go into all the time to order it? Well, I would say that considering the remoteness of the possibility is. That anyone would ever do this. Yes, considering the remoteness of the possibility that these plaintiffs will trigger the rule given the FDA's, excuse me, the over-the-counter ruling and the structure of the rule which would require ordering the out-of-stock drug. Counsel, isn't your argument based upon a reasonable customer, a legitimate customer, particularly one who in fact needs the drug, they need the drug now, not 72 hours from now? Yes, I think that is a factor to be considered in evaluating the total picture. Would it be incorrect for the plaintiffs to be fearful of somebody who is simply coming in to trigger the act? Again, I think the likelihood of that occurring is one of the factors that is thrown into the balance in considering ripeness. Isn't it more likely than in rural areas, for example, where you may not have a choice, of pharmacies that are available to you, that it might be triggered there than in a more metropolitan area where you can go to the next street corner and find another pharmacist? That may be the case. In addition to the overall unlikeliness of the act being triggered, there is a variance provision here. And the variance provision allows these plaintiffs to pursue a statutory variance procedure that grants the director the authority to exempt a licensee from complying with an administrative rule in certain circumstances. And the director may grant these variances where the director finds that the provision from which the variance is sought is not mandated by statute, and granting the variance would not cause injury, and applying the provision would not be unnecessarily burdensome in the particular case. If we agree with Mr. Rienzi that there's already a record that the purpose and intent of the rule was to force pharmacies to violate their moral convictions, and if we agree that there's been a record established, be it the Bogoyevich website or not, based on the case law that Mr. Rienzi indicated, I don't know how we would hold on that. I mean, doesn't that in and of itself defeat the variance provision? Not at all, Your Honor. I mean, doesn't it indicate that the whole purpose was to thwart the moral conviction of the pharmacist? Why would a variance ever be granted? And let me just give you Part B of the question. You don't concede, as you said. In fact, the State has never conceded that a variance would ever be granted in this case. Well, perhaps to take Part B first, the State couldn't concede or address whether a variance could be presented in these particular circumstances precisely because the plaintiffs have never made their factual case for a variance, which is a very fact-dependent inquiry, and the plaintiffs here say that they have four stores and they allege a singular application of the rule because they say that we are pharmacy owners who do not wish to even stock emergency contraception because of our owners' religious objection, and that puts them in very different circumstances from the typical scenario, which is a large chain pharmacy that does not have objections to stocking or dispensing emergency contraception. It's merely that individual employees might. But if the purpose of the rule is coercion, give me a set of facts where a variance would be granted. Well, for example, if these plaintiffs were able to show that, well, I can't make any representations about when a variance would be granted, but if they could put in facts to say we have a particular burden because we are the unique case of a religious institution and therefore this rule burdens us in a way that it does not burden others, and there is Walgreens and a CVS within a block from here, perhaps that presents a factual case that would be worthy of consideration given the competing interests involved. But they have never taken that step. They have never presented a factual case for the director's consideration. The fact that... A religious institution. These plaintiffs allege that they are pharmacies who do not wish to dispense contraception based on the religious objections of their owners, which is most of the rule applies to all pharmacies. Most pharmacies do not have religious objections to dispensing emergency contraception. You also addressed the... Would there be a point to seeking a variance? The governor has made statements indicating that the rule would be enforced, but nothing in the governor's statements, and the governor's statements show support for the rule and promote the goal of access to prescription contraceptives, whatever the reasons for not dispensing those contraceptives. Nothing in the governor's statements suggests that a variance would be inappropriate in a particular case where it was otherwise warranted. The governor's statements don't speak to that at all. Well, counsel, on this variance question, if I could just take a different approach on it. You're arguing that they should exhaust this type of administrative remedy. You cited Section 1330.110 in your brief. Is that the right... It's in the statute. What you have cited is an administrative rule that codifies that, or that follows that statutory language, but it's also in the Pharmacy Act itself. So it's as if that variance procedure, we can just read that variance procedure into the rule whose ripeness is under review. All right. But is there any additional requirement in the statute that's not reflected in the regulation? No. All right. I don't see anything in there that sets out some procedure for a pharmacist or pharmacy to ask for a variance. And I'm not faulting that. I'm just saying it gives complete discretion to the director, and I'm just wondering what more would the director want to know from these people that they want a variance. They've taken this all the way to the Illinois Supreme Court. If you're taking a position they should apply for it, why don't you just grant it to them? Case is over. I'm sorry. I'm sorry. Follow your question. Your own regulation, you say, is modeled after the statute. It gives complete discretion to the director. You're taking the position they should apply for the variance, and it's up to the discretion of the director to grant it. What other information would the director need about what's in the litigation already? The directors, well, they haven't applied for the variance already, and they haven't made a factual case. Is there an application procedure? Yes. I mean, there are practices. What does the regulation say subject to an application? The regulation doesn't lay out each step, but, I mean, they would apply to the department in writing and lay out their case, a factual-based case for a variance. I'm just saying that based on your citation, when I read it, there is no directive to me if I'm a pharmacist on how to apply for a variance. It just says that the director may grant. It doesn't say send in a letter. It doesn't say send in an application. Make a phone call. It doesn't say anything like that. The statute itself does not get into that level of detail, but that's not really an obstacle to following the statutory procedure, which is there for people to use to make variance requests and then for the director to consider whether there's an appropriate factual case made. Well, my only question, and I'll leave it, is what procedure is there that's in this regulation that you're referring to? Because I don't see it. I don't see any procedure. Just that the director may grant variances. As a practical matter, the procedures involve writing to the department and presenting the facts. The director considers the factual case that's presented under these standards, whether the facts show that injury would be caused and applying the rule would not be unnecessarily burdensome. And then the director, in consultation with the pharmacy board, issues a decision in writing. I think you've laid out a procedure, but what you've done is been a good lawyer and give us a good procedure. We don't know that that's the procedure that would apply in this case. It is the procedure that would apply in this case. And we might not know every detail of does the department prefer a form, does the department prefer a letter. The statute doesn't address these minuscule details, but the statute is clearly … The statute says the director has it within his authority to grant a variance. In certain defined circumstances here. That is a procedure that has not been followed. I'd like to have a moment to finish up. That procedure has the ability to obviate any need for judicial review here. The fitness consideration addresses both whether a claim can be intelligently decided or whether it should be decided, whether this is a claim that warrants judicial resources at this time. It's not … This can also be analyzed as an exhaustion question, and there are no exhaustion exceptions that apply. With respect to the merits, that has never been … A lot of the arguments here have been addressed to the merits. They've never been raised before the circuit court or the appellate court. They've never been raised in the PLA. We're hearing about the merits for the first time here, and contrary to the representations, there are significant issues of law and fact involved, which present reasons why this court should refrain. And there's also an amended version of the rule, which is still working its way through the amendment process. It has not yet been finally approved, but it's another reason why the court should not consider the merits. Just … I had a couple things based on what you had said, but I'll just leave you with one, and it really dovetails off of Justice Kilbright's question. You know, we are forced with some speculation here, as it affects the rightness question. Initially, we talked about, you know, whether it's likely to occur, but even on this issue of the variance that Justice Kilbright raised, you know, he left you with, what else do they need? The case would be over. It's a nine-count complaint, you know, against the governor, as one of the parties, that was filed October 28th of 2005. You know, we're in March of 2008. I mean, do we need more, as Justice Kilbright said, to say if a variance was ever going to be granted, in light of this litigation, it would have been granted. I mean, and then the case would have been over. But it's never been requested, Your Honor. They have never initiated a request for a variance. There's been a lawsuit for three years. But as he indicated, this is a case that went through the trial appellate and now the Supreme Court. I mean, are we to assume that there wouldn't have been discussions going back and forth if there was a chance for a variance to have been granted in this situation? These plaintiffs have never made any kind of request to the Department, initiated any discussions of what do we have to supply to you in terms of a variance. It's not a step that the plaintiffs have taken. It is a step that is available to the plaintiffs. It depends on a factual showing because we need to know, are there other pharmacies nearby? What are your circumstances? Why is this burden so unique to you? None of which these plaintiffs have put before the Department. And all of which, you know, in speaking of is there some coercion here, to the extent the plaintiffs have concerns about this rule being applied to them, seeking a variance was a way to allay those concerns and find out if they would qualify for an exemption from the rule, and they have never pursued that procedure. And Ms. Warner, just to be, if you could make the answer quick, but I want to be fair to you since you have to sit down, and I anticipate Mr. Rienzi will touch upon what you didn't have a long time to go into, and that is on the administrative exhaustion. Is this a case that requires experts in an administrative hearing to come in and testify, or are we really ruling on this case, and is the case being presented as the statutes involved, whether it be the Religious Act, the Conscience Act, the Pharmacy Act? Because I think one of the things that you just quickly, you know, pointed out is there's no exceptions to administrative exhaustion in this case. Is that right? I was addressing the variance procedure there, because the variance question can be looked at in terms of rightness and can also be looked at alternatively as an exhaustion of administrative remedies question. Right. If it were looked at as an exhaustion of administrative remedies question, there are exhaustion exceptions, such as is this a facial challenge, that wouldn't apply. This is not a proper facial challenge. The rule applies, absent a variance, to all pharmacies, but not all pharmacies have religious exceptions. The other exhaustion requirement speaks to futility, and we've had some discussion of that. The mere fact that the rule is being enforced falls far, far short of establishing that seeking a variance would be futile here. That's a patently useless act, and we cannot say that, particularly as here, these plaintiffs do have, are in a rather unique position, because they are institutions with religious objections, and that is unlike the typical situation for pharmacies. So if it's viewed as an exhaustion question, there would not be any applicable exceptions. I understand your argument. Was the other part of your question addressed to the merits? I was a little unclear. No, I was just asking about the exhaustion question. Thank you, Ms. Wunder. Rebuttal, Mr. Ramsey. Thank you, Your Honor. The variance procedure we respectfully submit is a litigation position that first surfaced in appellate briefing in this case. At no point was it a realistic option. The state has said that they need to hear facts like what other pharmacies are nearby. Well, the state defendants regulate every pharmacy in the state. They know what other pharmacies are nearby. They say they want to hear about our particular unique claims of right. Well, our claims are in the complaint in great detail, and they've been in all of our briefs, and our claims of right are particularly under the Health Care Right of Conscience Act, which the defendants have already publicly, repeatedly, and before this Court said they do not believe applies to pharmacists and pharmacies. Seeking a variance is unnecessary under Illinois law under several cases, but, again, I'd refer the Court to Connell v. Topenka. Connell focuses both on the fact that there is no need to pursue administrative remedies where there is a facial challenge, but also that there is no need to pursue administrative remedies where the challenge is a straightforward legal challenge. And in Connell, this Court specifically said that it would not confine itself to a facial challenge and went on to evaluate the rule as applied to specific plaintiffs. The variance procedure that Justice Kilbride referred to also would preclude the defendants here from actually giving one to anyone, at least to these plaintiffs. The defendants have said in their briefs that they think the harm under this rule needs to be evaluated on a case-by-case basis. This is their merits argument. Well, if it needs to be evaluated on a case-by-case basis, there's no way the State could at the same time find under the variance procedure that no one would ever be harmed. They say in their briefs that this rule is simply a clarification of existing law. Well, the variance procedure would require them to find the opposite. It would require them to make a finding that the rule is not required by law. Again, we'd submit the variance procedure is not a legitimate option in this case, and if at any point the defendants were interested in granting anyone a variance under this rule, they certainly could have. And again, in Connell v. Topenka, the State made the same argument about a provision that allowed it to repay certain dividends to owners of lost property that was in the State's possession. But this Court said the fact that the State has never actually done that. They've never actually exercised that discretion in anyone's favor, weighed against finding any need to go pursue that remedy, and that's the situation we're in here. As to the State's arguments about remoteness, those arguments are sheer speculation, and they're improper at the motion-to-dismiss stage for this Court or the defendants or the appellate court to be engaging in speculation and inferences against what is pled in the complaint. What's pled in the complaint is that this has happened before, that the plaintiffs have ongoing policies against dispensing the drug, that the rule requires them to dispense the drug, that it happened multiple times at multiple different pharmacies. The State's argument assumes facts. It assumes that the only circumstances in which someone comes to the store and demands that a pharmacy fill the drug is that that person's actually currently experiencing an emergency. Of course, that's not at all the only circumstance in which someone could seek this drug. The American College of Obstetricians and Gynecologists recommends to all of its members that they affirmatively ask women ahead of time, do you want to have a prescription for this drug so that you can have it on hand to be prepared if something happens? It's also not at all out of the question that there could be politically motivated people who would be seeking to test the plaintiffs, and in that case, if they did seek to test the plaintiffs, the plaintiffs would be in severe jeopardy right away. Also, Justice Freeman, you pointed out that there was an option of transferring the prescription. The plaintiffs have pled in the complaint that they cannot cooperate in the sale, and Mr. Vanderbleek's policy, which is attached as Exhibit A to the complaint, says that the only actions his pharmacists are allowed to take are to return the prescription politely and nonjudgmentally, but return the prescription and say, I'm sorry, we can't fill that here. These pharmacists cannot and will not take the prescription in, put it on their computer, and send it to another pharmacy. That would violate their religion. That would force them to participate in the sale or dispensing of this drug, and that's what they're asking not to be forced to do. Counsel, if I may. Yes, sir. Could you address the two affidavits, and I think it's two affidavits, and whether or not we can consider them or not? Yes, Your Honor. Two points. One, the court can certainly consider them. It is very clear that ripeness, unlike other doctrines, is an analysis that is performed at the time of the appeal. In other words, the court is not required to just bury its head in the sand and look the other way about everything that's happened in the past two and a half years. Instead, the court is permitted to consider subsequent evidence, and that's what these affidavits are. The appellate court improperly speculated against the plaintiffs, and made inferences against what's pled in the complaint, instead of making inferences in the plaintiff's favor. And it made those inferences, and they were factually incorrect. The plaintiffs have a right to submit affidavit evidence to the court for the court to consider, because ripeness is supposed to include all of the facts. Here, those facts are very, very important, because they show that the rule has a real, concrete effect, even if we take the State's argument as true about the remoteness of someone actually triggering it, which we don't. But even if you do, the existence of this rule has a coercive effect. It has an impact on employees who justifiably, when they are thinking of working for one of the plaintiff's pharmacies, say, boy, I'm not sure I want to work here, because the governor has said repeatedly that he could take the license away from any pharmacy that won't dispense these drugs, that you, Mr. Vanderbleek or Mr. Kosorov, don't want dispensed in your pharmacy. And because of an issue like that, there were originally five pharmacies that were covered by the corporation's pled in the complaint. There's one, I believe, pled in Paragraph 8 of the complaint that was in Profittstown, Illinois. That pharmacy is closed as a result of this issue. This is not an abstract or a remote issue for the plaintiffs. Also, I want to clarify something that was raised in the State's brief about the affidavits. The State parses the language in those affidavits to- The pharmacy was closed as a result of this issue. Yes, Your Honor. Was the license revoked? Its license was not revoked, but it was unable to- The person who had been hired and had committed to working at the pharmacy ended up having to withdraw and said he was withdrawing specifically because of his concerns about this issue. And the plaintiff was unable to replace that pharmacist. That's a break-in. That is in the affidavits which we submit are properly before the court as evidence of ripeness. I'd like to also point out for the court that there's an important parallel to abortion cases here, which is in abortion cases, which are frequently challenged before the law even goes into effect, the complaint essentially goes as follows. The doctor says, I have performed this procedure in the past. My doors are open. I would perform it in the future if somebody comes in and asks me for it, and I need to know whether I can do it or not. I need to know whether it's illegal or not. And courts routinely find that to be sufficient for standing. And two of the cases we've cited are Planned Parenthood v. Farmer and Doe v. Bolton. The courts do not say at that point, well, wait until you have someone under 18 before you come in to chat. Wait until there's someone in your office who's under 18, and then we'll let you challenge a parental consent law. No, that's not the rule, and it shouldn't be the rule, frankly, because people need to know if your doors are open for business and it's a service that you provide and it's a situation that you've been in the past, when it happens again, am I A, within my constitutional rights, or B, violating the law and risking my license? People have a right to know. The doctors in those abortion cases have standing, and it's never really questioned that they have standing, and it's right that they have standing. And the same thing for the plaintiffs here. The plaintiffs have to know, can they do it or not? Lastly, I just want to emphasize, the plaintiffs came to court not seeking to interfere with any other pharmacist's willing decision to dispense this drug or a doctor's willing decision to prescribe it or a customer's willing decision to take it. They came to court seeking the protection of the courts, consistent with Illinois law, from deliberate government coercion that they themselves may be forced to be involved in dispensing a drug that violates their religion. The Illinois General Assembly has made it clear that the law and policy of this state is to respect and protect the right of conscience of all people involved in all health care services, including medication, family planning, contraceptives. The governor does not get to change that policy, and the other defendants do not get to change that policy and that law by issuing press releases or administrative rules or even by argument to this court. But this is a facial challenge, though, to this rule. Is that correct? It is both facial and as applied. The complaint, please spell. Okay, thank you. The plaintiffs have labored under the illegal coercion of this rule for nearly three years, and during that time the plaintiffs have been forced to close a pharmacy, and this court can observe from other cases that pharmacists have been fired, pharmacists have lost their licenses, pharmacists have been suspended. The illegal coercion of this rule has gone on long enough, and the plaintiffs respectfully request that this court find the plaintiffs' claims ripe, determine that the rule is invalid under the Health Care Right of Conscience Act, and end this controversy now. If the court has no further questions, we're done. Thank you, Mr. Ranze. Thank you, Ms. Wunder. Case number 104-692, Morfitts, Inc., etc., et al. versus Radar-Badoyevich, Governor, et al., is taken under advisement as agenda number 15.